## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **KRISTY L. RIFE,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:06cv00101 |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **MICHAEL J. ASTRUE,**[1] | ) | |
| **Commissioner of Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

### I. Background and Standard of Review

Plaintiff, Kristy L. Rife, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for supplemental security income, ("SSI"), and disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

---

[1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d)(1).

Case 1:06-cv-00101-PMS   Document 18   Filed 07/31/07   Page 1 of 23   Pageid#: 57

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Rife protectively filed her applications for SSI and DIB on or about June 22, 2004, alleging disability as of April 30, 2002, based on knee, back and neck pain, "nerves," depression and inability to concentrate.[2] (Record, ("R."), at 69, 71-73, 91.) The claims were denied initially and on reconsideration. (R. at 27-29, 32, 33-35.) Rife then requested a hearing before an administrative law judge, ("ALJ"). (R. at 38.) The ALJ held a hearing on March 1, 2006, at which Rife was represented by counsel. (R. at 246-85.)

By decision dated May 25, 2006, the ALJ denied Rife's claims. (R. at 12-24.) The ALJ found that Rife met the nondisability insured status requirements of the Act for DIB purposes through March 31, 2007.[3] (R. at 14.) The ALJ found that Rife had

---

[2]Rife's SSI application is not contained in the record.

[3]In order for Rife to be entitled to DIB benefits, she must demonstrate disability on or prior to March 31, 2007.

-2-

not engaged in substantial gainful activity at any time relevant to the decision. (R. at 14.) The ALJ found that the medical evidence established that Rife had severe impairments, namely back pain, "fibromyalgia," but not diagnosed by a rheumatologist, depression and headaches, but she found that Rife's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15-17.) The ALJ also found that Rife retained the functional capacity to perform the exertional demands of light[4] work, diminished by a need for a sit/stand option each hour, an inability to climb ladders, ropes and scaffolds and an occasional ability to climb ramps and stairs, to balance, to stoop, to kneel, to crouch and to crawl. (R. at 19.) The ALJ further found that Rife's ability to concentrate was moderately reduced, thereby limiting her to the performance of simple, noncomplex tasks. (R. at 19.) Thus, the ALJ found that Rife could not perform her past relevant work. (R. at 23.) Based on Rife's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ concluded that Rife could perform jobs existing in significant numbers in the national economy, including those of an office clerk, at both the light and sedentary levels of exertion. (R. at 23-24.) Therefore, the ALJ found that Rife was not under a disability as defined in the Act, and that she was not eligible for benefits. (R. at 24.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2007).

After the ALJ issued her decision, Rife pursued her administrative appeals, (R. at 8-9), but the Appeals Council denied her request for review. (R. at 5-7.) Rife then filed this action seeking review of the ALJ's unfavorable decision, which now stands

---

[4]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2007).

as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2007). The case is before this court on Rife's motion for summary judgment filed February 27, 2007, and on the Commissioner's motion for summary judgment filed April 2, 2007.

*II. Facts*

Rife was born in 1975, (R. at 71), which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). She has a high school education and past work experience as a certified nursing assistant, ("CNA"), a fast food worker and a cashier. (R. at 23, 117.)

Rife testified that she quit working as a cashier at Advance Auto Parts on June 1, 2002, due to foot pain, back pain, knee pain, leg pain and neck pain. (R. at 261.) She stated that she and her husband separated in August 2003, when her children were three years old and five months old. (R. at 252-53.) Rife testified that she was depressed prior to the separation, but that "[m]ostly, it hit [her] then." (R. at 253-54.) She stated that she began seeing a mental health professional at Life Recovery almost two years prior to the hearing, soon after her husband left. (R. at 256.) Rife testified that she had been prescribed Zoloft, Wellbutrin and Effexor for depression, which "helped some." (R. at 257-58.)

Rife testified that she had not thought about getting another job because she "usually [did not] leave the house." (R. at 267.) She stated that although her therapist had told her to "get a life," all she thought about was "staying home all the time. Don't want to be around nobody." (R. at 267.) She stated that she "snap[ped] at her

-4-

[daughter] over everything." (R. at 269.) She further stated that her father, who lived next door, took her daughter to the bus stop and picked her up. (R. at 269-70.) Rife testified that she had crying spells and did not get out much. (R. at 277.) She stated that her mother usually shopped for her, but that she shopped approximately once a month. (R. at 277.) Rife stated that she did not socialize at all. (R. at 278.) She stated that she used to go outside a lot and walk, but she could not do so any longer. (R. at 278.) Rife testified that she attended church weekly. (R. at 278.) She stated that the only thing she did during the day was try to get her three-year old son to eat. (R. at 278-79.)

Bonnie Martindale, a vocational expert, also was present and testified at Rife's hearing. (R. at 279-84.) Martindale classified Rife's past work as a cashier and as a fast food worker as light and unskilled and as a CNA as medium[5] and semiskilled. (R. at 280.) Martindale was asked to consider a hypothetical individual of Rife's age, education and work experience who could perform work at the light level of exertion, who had moderate limitations on the ability to concentrate, who was limited to the performance of fairly simple, noncomplex tasks and who could occasionally climb, balance, kneel, crouch, crawl and stoop. (R. at 280-81.) Martindale testified that such an individual would need a sit/stand option and could perform the jobs of an office clerk, at both the light and sedentary levels of exertion. (R. at 281.) Martindale testified that an individual with the limitations set forth in Dr. Sutherland's assessment would not be able to perform jobs previously mentioned. (R. at 283.) Martindale

---

[5]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2007).

-5-

testified that an individual with the limitations set forth in Dr. Gillespie's mental assessment would not be able to work. (R. at 283.)

In her Social Security Administration Adult Function Report, Rife estimated that she could pay attention for 5 to 10 minutes. (R. at 86.) She stated that her ability to follow written instructions was "not to[o] good," and her ability to follow spoken instructions was "fair." (R. at 86.) Rife claimed that she was unable to finish things that she started such as a conversation, chores, reading, or watching a movie. (R. at 86.) Rife stated that she watched television, rested, and took care of her two children during the day. (R. at 81-82, 85.) She stated that she was able to prepare microwavable meals and perform household chores, such as cleaning or laundry, daily. (R. at 83.) Rife also stated that she was able to drive a vehicle and go out alone, but that she did not get out often because she did not feel like going anywhere. (R. at 84.)

In rendering her decision, the ALJ reviewed records from Pikeville Orthopedic Surgery; Life Recovery; Dr. J.P. Sutherland Jr., D.O.; Clinch Valley Medical Center; Dr. Muhammad R. Javed, M.D.; Dr. Richard M. Surrusco, M.D., a state agency physician; Dr. Randall Hays, M.D., a state agency physician; Julie Jennings, Ph.D., a state agency psychologist; Dr. Sharad Sawant, M.D.; Dr. Hal G. Gillespie, M.D.; E. Hugh Tenison, Ph.D., a state agency psychologist; and Dr. Marilou Inocalla, M.D.

On February 3, 2004, Dr. J.P. Sutherland Jr., D.O., gave Rife samples of Zoloft. (R. at 148, 219.) His diagnoses at that time were common vascular migraines, lumbar myositis, dysfunctional low back, chronic fatigue syndrome, cluster-type headaches, cervical tendinitis and premenstrual syndrome. (R. at 148, 219.) Rife did not complain

of anxiety or depression, nor was she diagnosed with either. (R. at 148, 219.) Dr. Sutherland's treatment note does indicate that she was referred to Dr. Sharad Sawant, M.D., at Life Recovery. (R. at 148, 219.) On March 5, 2004, Rife saw Dr. Sawant. (R. at 125-27, 225-27.) Rife reported that she "need[ed] medications." (R. at 125, 225.) She reported experiencing depression and anxiety for the previous seven months, and she stated that she had experienced six crying spells. (R. at 125, 225.) Rife further reported feelings of hopelessness and helplessness and past suicidal thoughts with no plan. (R. at 125, 225.) She reported anhedonia, lack of any pleasurable feelings, poor concentration and a preoccupation with thoughts about her separation. (R. at 125, 225.) Rife also noted poor sleep, a fair appetite and low energy. (R. at 125, 225.) In Dr. Sawant's mental status examination of Rife, he noted psychomotor retardation, a depressed mood and a restricted affect. (R. at 127, 227.) He further noted poor abstraction, a fair fund of knowledge and fair insight and judgment. (R. at 127, 227.) Dr. Sawant diagnosed Rife with major depressive disorder, single episode, moderate, and a then-current Global Assessment of Functioning, ("GAF"), score of 55.[6] (R. at 127, 227.) He concluded that Rife was depressed and anxious with severe psychosocial stressors. (R. at 127, 227.) He increased her dosage of Zoloft and advised her to find a therapist near her home. (R. at 127, 227.)

On April 16, 2004, Rife again saw Dr. Sawant and reported "doing ok." (R. at 128, 223.) She reported feeling tired and "stressed out" over her impending divorce

---

[6]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 51-60 indicates that the individual has "[m]oderate symptoms...OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32.

and custody battle. (R. at 128, 223.) Rife reported suicidal thoughts with a plan to drive her car "down a cliff," but she stated that she would not act on it due to thoughts of her children. (R. at 128, 223.) She stated that medication helped her. (R. at 128, 223.) Rife reported sleeping five to six hours each night, a fair appetite and low energy. (R. at 128, 223.) Mental status examination revealed psychomotor retardation, a depressed and anxious mood and a restricted affect. (R. at 128, 223.) Dr. Sawant diagnosed major depressive disorder, single episode, severe. (R. at 128, 223.) Nonetheless, he noted that Rife's mood was improved. (R. at 128, 223.) She was advised to find a therapist and begin psychotherapy. (R. at 128, 223.) Rife saw Dr. Sawant again on June 16, 2004, at which time she noted that she was "doing ok." (R. at 129, 224.) She relayed concerns about her impending divorce, finances and taking care of her children. (R. at 129, 224.) Rife reported fair sleep, fair appetite and low energy. (R. at 129, 224.) Dr. Sawant again noted psychomotor retardation, a sad and anxious mood and a restricted affect. (R. at 129, 224.) He rated her insight, judgment, motivation and fund of knowledge as fair. (R. at 129, 224.) Rife was again diagnosed with major depressive disorder, single episode, severe. (R. at 129, 224.) Dr. Sawant noted that Rife's mood was better. (R. at 129, 224.) He continued her on Zoloft and prescribed Wellbutrin. (R. at 129, 224.)

On July 14, 2004, Dr. Sutherland gave Rife samples of Zoloft, although his treatment note does not indicate any mental health complaints. (R. at 137, 163, 220.) On August 31, 2004, Rife again saw Dr. Sawant and reported doing "so-so." (R. at 188, 230.) She advised him that she was spending her time taking care of her children. (R. at 188, 230.) Rife reported less crying spells, less hopelessness and no suicidal or homicidal thoughts. (R. at 188, 230.) She further reported six to seven hours of sleep

each night, fair appetite and low energy. (R. at 188, 230.) Dr. Sawant noted no psychomotor retardation, but he reported that Rife had a sad and anxious mood with a restricted affect. (R. at 188, 230.) Rife's insight, judgment, motivation and fund of knowledge were deemed fair. (R. at 188, 230.) She was diagnosed with major depressive disorder, single episode, severe. (R. at 188, 230.) Dr. Sawant continued her on Zoloft and increased her dosage of Wellbutrin. (R. at 188, 230.) He again recommended psychotherapy. (R. at 188, 230.)

On November 17, 2004, Dr. Sutherland diagnosed stress anxiety disorder, despite no complaints from Rife. (R. at 164, 221.) She was again given samples of Zoloft. (R. at 164, 221.) On November 18, 2004, Julie Jennings, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Rife suffered from a nonsevere affective disorder. (R. at 173-86.) Jennings opined that Rife was only mildly restricted in her activities of daily living, experienced mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation. (R. at 183.)

On December 5, 2004, Dr. Sutherland noted that Dr. Sawant had prescribed Wellbutrin in addition to Zoloft. (R. at 164, 221.) Rife was given more samples. (R. at 164, 221.) On January 12, 2005, Dr. Sutherland again diagnosed stress anxiety disorder, despite no complaints from Rife. (R. at 165, 222.) He advised her to contact Cumberland Mental Health Services, and she was continued on medications. (R. at 165, 222.)

-9-

On January 21, 2005, Rife saw Dr. Hal G. Gillespie, M.D., at Life Recovery. (R. at 231.) At that time, Rife noted varied sleep, an "ok" appetite and variable energy. (R. at 231.) She further noted "more dep[ression]." (R. at 231.) Dr. Gillespie noted that Rife's mood was moderately depressed and that she exhibited limited concentration. (R. at 231.) Her memory was intact, and her insight and judgment were adequate. (R. at 231.) Rife admitted occasional suicidal thoughts with no plan. (R. at 231.) Her psychomotor behavior was described as calm. (R. at 231.) Dr. Gillespie advised counseling for stress management, but Rife stated that she could not afford psychotherapy. (R. at 231.) She was continued on Wellbutrin, Zoloft was discontinued, and Dr. Gillespie prescribed Effexor. (R. at 231.) He diagnosed Rife with major depression, moderately severe. (R. at 231.)

E. Hugh Tenison, Ph.D., a state agency psychologist, completed a mental assessment on April 6, 2005, finding that Rife was moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors and to respond appropriately to changes in the work setting. (R. at 189-92.) He found no evidence of any limitation on Rife's ability to make simple work-related decisions. (R. at 189.) In all other categories of mental functioning, Tenison found that Rife was not significantly limited. (R. at 189-90.)

-10-

Tenison also completed a PRTF, indicating that Rife suffered from an affective disorder and that a residual functional capacity assessment was necessary. (R. at 193-206.) Tenison opined that Rife experienced no limitation on her activities of daily living, experienced no difficulties maintaining social functioning, experienced moderate difficulties maintaining concentration, persistence or pace and had experienced no episodes of decompensation. (R. at 203.) Tenison found Rife's mental allegations only partially credible. (R. at 206.) He concluded that her depression would likely limit her to the performance of simple, nonstressful work. (R. at 206.)

On April 26, 2005, Rife reported that she was "about the same" and had gone through a lot of stress the previous month. (R. at 232.) She noted that her sleep was "ok" most of the time, her appetite was good and her energy was improved. (R. at 232.) Dr. Gillespie noted that Rife's mood was fairly good, and her insight and judgment were adequate. (R. at 232.) He noted that her concentration was fair, but varied, her memory was intact, her focus was "ok" and her attention span was limited. (R. at 232.) Dr. Gillespie further noted that Rife's psychomotor behavior was calm and that she had occasional suicidal thoughts, but that thoughts of her children prevented her from following through. (R. at 232.) Rife's diagnosis and medications remained unchanged. (R. at 232.)

On August 20, 2005, Rife saw Dr. Gillespie, stating that she had "good [days] [and] bad days." (R. at 242.) She reported no social activity and no interest in life. (R. at 242.) Rife noted an average of six hours of sleep each night, a variable appetite and low energy. (R. at 242.) Dr. Gillespie noted a flat affect, a low, depressed mood, "terrible" concentration, "terrible" memory, poor focus, a short attention span and

-11-

competent insight and judgment.  (R. at 242.)  Dr. Gillespie noted that Rife's psychomotor behavior was "slowed down," but her fund of knowledge was "okay." (R. at 242.)  Rife's diagnosis and medications remained unchanged.  (R. at 242.)

On November 8, 2005, Dr. Sutherland prescribed Wellbutrin.  (R. at 233.)  On December 15, 2005, Dr. Marilou Inocalla, M.D., described Rife's mood as anxious with some depression.  (R. at 240-41.)  Rife reported "not much social activity."  (R. at 240-41.)  Rife reported getting an average of about six hours of sleep each night, a variable appetite, low energy, no motivation and no interest in life.  (R. at 240-41.) Dr. Inocalla described Rife's affect as flat and her mood as low and depressed.  (R. at 240-41.) Rife's insight and judgment were deemed competent, her concentration scattered, her memory as intact for simple tests, her focus poor and her attention span short.  (R. at 240-41.) Dr. Inocalla noted that Rife's psychomotor behavior was normal and her fund of knowledge was "okay."   (R. at 240-41.) Her diagnosis and medications remained unchanged.  (R. at 240-41.)

On February 28, 2006, Dr. Gillespie completed a mental assessment finding that Rife was moderately limited in her ability to understand, remember and carry out short, simple instructions, moderately to markedly limited in her ability to understand, remember and carry out detailed instructions and to make judgments on simple, work-related decisions, markedly limited in her ability to interact appropriately with the public, to interact appropriately with supervisors, to interact appropriately with co-workers and to respond appropriately to changes in a routine work setting and that she was markedly to extremely limited in her ability to respond appropriately to work pressures in a routine work setting.  (R. at 238-39.)  Dr. Gillespie stated that he was

-12-

basing his opinion on a face-to-face evaluations of Rife and testing of Rife's memory, focus and judgment. (R. at 238-39.) Dr. Gillespie further noted that Rife was "quite depressed, socially withdrawn; unable to engage in concrete, difficult tasks." (R. at 238.) Nonetheless, he opined that Rife was able to manage benefits in her own best interest. (R. at 239.)

### III.  Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2007).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in

-13-

the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated May 25, 2006, the ALJ denied Rife's claims. (R. at 12-24.) The ALJ found that Rife met the nondisability insured status requirements of the Act for DIB purposes through March 31, 2007. (R. at 14.) The ALJ found that the medical evidence established that Rife had severe impairments, namely back pain, "fibromyalgia," but not diagnosed by a rheumatologist, depression and headaches, but she found that Rife's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15-17.) The ALJ also found that Rife retained the functional capacity to perform the exertional demands of light work, diminished by a need for a sit/stand option each hour, an inability to climb ladders, ropes and scaffolds, and an occasional ability to climb ramps and stairs, to balance, to stoop, to kneel, to crouch and to crawl. (R. at 19.) The ALJ further found that Rife's ability to concentrate was moderately reduced, thereby limiting her to the performance of simple, noncomplex tasks. (R. at 19.) Thus, the ALJ found that Rife could not perform her past relevant work. (R. at 23.) Based on Rife's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ concluded that Rife could perform jobs existing in significant numbers in the national economy. (R. at 23-24.) Therefore, the ALJ found that Rife was not under a disability as defined in the Act, and that she was not eligible for benefits. (R. at 24.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2007).

Rife argues that the ALJ erred by failing to find that her mental impairments

-14-

met or equaled the criteria for § 12.04, the medical listing for affective disorders. (Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-11.) Rife further argues that the ALJ erred by substituting her judgment for that of trained mental health professionals, specifically her treating psychiatrists. (Plaintiff's Brief at 9-11.) Rife does not contest the ALJ's finding with regard to her physical residual functional capacity.

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if she sufficiently explains her rationale and if the record supports her findings.

-15-

The qualifying criteria for the listed impairment for affective disorders is found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04. To meet the requirements of this section, a claimant must show that she suffers from at least four of the listed symptoms of depressive syndrome, which result in at least two of the following:

1.      Marked restriction of activities of daily living;
2.      Marked difficulties in maintaining social functioning;
3.      Marked difficulties in maintaining concentration, persistence, or pace; or
4.      Repeated episodes of decompensation, each of extended duration.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(A)(1), 12.04(B) (2007).[7] A claimant also may meet the requirements of this section if she has a medically documented history of a chronic affective disorder of at least two years' duration that has caused more than minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1.      Repeated episodes of decompensation, each of extended duration; or
2.      A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3.      Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication or continued need for such an arrangement.

_____

[7]These criteria contained in 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04 are commonly referred to as the "B" criteria.

Case 1:06-cv-00101-PMS   Document 18   Filed 07/31/07   Page 16 of 23   Pageid#: 72

20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.04(C) (2007).[8]

The record is clear that Rife began treatment for a mental impairment in March 2004, when she was diagnosed by Dr. Sawant with major depressive disorder, single episode, moderate. (R. at 127, 227.) However, for the following reasons, I find that substantial evidence supports the ALJ's finding that Rife's impairment fails to meet the "B" criteria of § 12.04.

"Marked," as used in § 12.04, is defined as "more than moderate but less than extreme." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C (2007). That section proceeds to state that "[a] marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such to interfere seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C (2007). I first find that substantial evidence supports the ALJ's finding that Rife's mental impairment did not result in marked limitations on her activities of daily living. Rife reported that she takes care of her two young children, with some assistance from her parents, who live next door to her. (R. at 81-82, 269, 276.) Specifically, she reported that she was able to get her daughter ready for school, put her children down for naps, prepare simple meals for herself and her children and bathe them. (R. at 81-83.) She further reported an ability to perform some household chores, including cleaning and washing laundry, albeit with rest periods. (R. at 83.) Rife reported no difficulty maintaining personal grooming and hygiene. (R. at 82.) She stated that she attended church weekly and was able to

_____

[8]These criteria contained in 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04 are commonly referred to as the "C" criteria.

Case 1:06-cv-00101-PMS   Document 18   Filed 07/31/07   Page 17 of 23   Pageid#: 73

grocery shop without assistance once or twice monthly. (R. at 84-85, 277-78.) Rife stated that she could handle her own financial affairs, including paying bills, counting change, handling a savings account and using a checkbook. (R. at 84.) Moreover, the record clearly indicates that Rife was able to attend various doctor's appointments without assistance. Finally, the opinions of the state agency psychologists do not support a finding that Rife was markedly limited in her activities of daily living. Specifically, in November 2004, state agency psychologist Jennings opined that Rife was only mildly restricted in her activities of daily living. (R. at 183.) Likewise, in April 2005, state agency psychologist Tenison opined that Rife experienced no limitations on her activities of daily living. (R. at 203.) For all of these reasons, I find that substantial evidence supports a finding that Rife was not markedly limited in her activities of daily living.

Next, I find that substantial evidence supports the ALJ's finding that Rife was not markedly limited in her ability to maintain social functioning.[9] For instance, although she reported being socially withdrawn and isolated, she is, nonetheless, by her own account, able to attend church services, grocery shop and attend doctor's visits. She also has exhibited no history of altercations with others, either in the work setting or in her personal life, with the exception of her statement that her children get on her nerves and that she "snaps" at her daughter over everything. (R. at 269.) Moreover, there is no evidence that Rife has ever been fired from a job or has had interpersonal difficulties in a work setting. Further supporting a finding that Rife did

---

[9]According to 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00C(2), social functioning refers to the ability to interact independently, appropriately, effectively and on a sustained basis with others. Impaired social functioning may be demonstrated by a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships or social isolation. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C(2) (2007).

not experience marked difficulties in maintaining social functioning are the opinions of the state agency psychologists. In November 2004, state agency psychologist Jennings opined that Rife experienced only mild difficulties in maintaining social functioning. (R. at 183.) In April 2005, state agency psychologist Tenison opined that Rife experienced no difficulties in maintaining social functioning. (R. at 203.) I note that this finding by Tenison seems inconsistent with his finding, on the same day, that Rife was moderately limited in her abilities to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors and to respond appropriately to changes in the work setting, all activities that involve social functioning under the definition set forth in the regulations at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00C. However, I find that, even assuming that Rife did suffer from moderate difficulties in maintaining social functioning, this still does not meet the "B" criteria of § 12.04 because, as noted above, "marked" means *more than* moderate limitations. *See* 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.00C (2007).

Although Dr. Gillespie found, in February 2006, that Rife was markedly limited in her ability to interact appropriately with the public, to interact appropriately with supervisors, to interact appropriately with co-workers and to respond appropriately to changes in a routine work setting, such findings simply are not supported by the record as a whole. It is true that Dr. Gillespie is Rife's treating psychiatrist. It also is true that the ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2007). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir.

-19-

1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

I note, as the Commissioner states in his brief, that Dr. Gillespie's opinion that Rife suffered from some marked mental limitations is not supported by the other substantial evidence of record. For instance, despite Rife's claim that she began suffering from a mental impairment sufficient to meet or equal the criteria of a listed impairment, namely § 12.04, in August 2003, shortly after she and her husband separated, she did not seek mental health services until March 2004, when she began seeing Dr. Sawant. (R. at 125-27, 225-27, 253-54.) Rife saw Dr. Sawant every two to three months through August 2004. (R. at 128-29, 183, 228-30.) Rife did not see another mental health source for five months when she began seeing Dr. Gillespie. (R. at 231.) Rife saw Dr. Gillespie approximately every three to four months for 25 minutes. (R. at 232, 242.) She then saw Dr. Inocalla in December 2005. (R. at 240-41.) Despite several recommendations that Rife begin psychotherapy, the record contains no evidence that she ever did so. I further note that when Rife did see Drs. Sawant, Gillespie and Inocalla, they performed only mental status evaluations, no objective psychological testing. Moreover, as the Commissioner contends, Dr. Gillespie's treatment notes do not support the harsh limitations imposed upon Rife in February 2006. For instance, although Rife had a moderately depressed mood in January 2005 at her initial visit with Dr. Gillespie, she had not seen a mental health source for five months. (R. at 231.) However, subsequent treatment notes from Dr. Gillespie show that Rife had a varied mood, ranging from fairly good to low,

-20-

depressed, she exhibited adequate or competent insight and judgment and she had intact memory for simple tasks. (R. at 232, 242.) Thus, Dr. Gillespie's treatment notes do not support the harsh limitations imposed on Rife in February 2006. I further note that Rife reported, and the record demonstrates, that medications helped to improve her mental condition. (R. at 257-58.) It is well-settled that "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). For all of these reasons, I find that substantial evidence supports the ALJ's rejection of Dr. Gillespie's assessment and, further, that Rife did not suffer from marked restrictions in maintaining social functioning.

Next, I find that substantial evidence does not support a finding that Rife has suffered from repeated episodes of decompensation, each of extended period. There simply is no evidence contained in the record from any mental health source that Rife has experienced such decompensation, which, according to 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00C(4), might be demonstrated by significant alterations in medications or hospitalization in a psychiatric facility or other structured living arrangement. Moreover, the state agency psychologists both found that Rife had not experienced such episodes of decompensation. (R. at 183, 203.) For these reasons, I find that substantial evidence supports a finding that Rife was not markedly limited in this area of mental functioning.

Finally, although Rife has the best argument for a marked limitation in the area of maintaining concentration, persistence or pace, I find it unnecessary to address this issue because, even assuming that she is markedly limited in this area of mental

functioning, she is unable to show a marked limitation in any of the other three areas of mental functioning specified in § 12.04(B), as would be required to meet or equal the listing.

Next, I find that Rife's mental impairment does not meet § 12.04(C). Specifically, I find that there is not evidence before the court that Rife's diagnosis has persisted for more than two years. Rife was first diagnosed with major depressive disorder in March 2004 by Dr. Sawant, and the last indication of the severity of her condition contained in the record was in February 2006, by Dr. Gillespie . (R. at 127, 227, 238-39.) Even if this were deemed to meet the two-year durational requirement, for the reasons outlined above, Dr. Gillespie's assessment was properly rejected by the ALJ. Prior to that February 2006 assessment, was Dr. Inocalla's diagnosis of major depressive disorder, moderately severe, in December 2005, thereby clearly not meeting the two-year durational requirement.

For all of the above-stated reasons, I find that substantial evidence supports the ALJ's finding that Rife's mental impairments did not meet or equal the criteria for affective disorders, set forth at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04.

Rife also argues that the ALJ erred by substituting her judgment for that of trained mental health professionals, particularly that of Dr. Gillespie, her treating psychiatrist. (Plaintiff's Brief at 9-11.) I disagree. I first note that, for reasons already discussed, substantial evidence supports the ALJ's rejection of Dr. Gillespie's assessment. Furthermore, it is clear that "[i]n the absence of any psychiatric or psychological evidence to support [her] position, the ALJ simply does not possess the

-22-

competency to substitute [her] views on the severity of plaintiff's psychiatric problems for that of a trained professional." *Grimmett v. Heckler*, 607 F. Supp. 502, 503 (S.D. W. Va. 1985) (citing *McLain*, 715 F.2d at 869; *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). However, fatal to Rife's argument is the fact that there is much psychiatric or psychological evidence, as outlined above, to support the ALJ's finding that Rife did not have a disabling mental impairment. Thus, I find that the ALJ did not improperly substitute her judgment for that of trained mental health professionals.

*IV. Conclusion*

For the foregoing reasons, Rife's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be granted, and the Commissioner's decision denying benefits will be affirmed.

An appropriate order will be entered.

DATED:    This 31st day of July 2007.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE